AO106 (Rev. 12/03)   Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

| SOUTHERN | DISTRICT OF | CALIFORNIA |
|---|---|---|

FILED
08 JAN 18 AM II: 04
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: ___ DEPUTY

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)
The residence located at:
151 Ely Street
Oceanside, California

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: **'08 MJ 0153**

I, __Leslie Y. Gorman__ being duly sworn depose and say:

I am a(n) __Special Agent with the U.S. Environmental Protection Agency__ and have reason to believe
                                      Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment "A" (incorporated herein).

in the __Southern__ District of __California__

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment "B" (incorporated herein).

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a Crime; fruits of a crime; property used in committing a crime.

concerning a violation of Title __7__ United States code, Section(s) __136j(a)(1)(A)__

The facts to support a finding of probable cause are as follows:

See attached Affidavit of EPA Special Agent Leslie Y. Gorman.

Title 42, United States Code, Section
7413(c)(1), and Title 49, United States
Code, Section 5124

Continued on the attached sheet and made a part hereof: ☑ Yes   ☐ No

_Leslie Y. Gorman_
Signature of Affiant

Sworn to before me and subscribed in my presence,

__1-16-08__                     at   __San Diego__      __CA__
Date                                  City                   State

| Nita L. Stormes | U.S. Magistrate Judge |
|---|---|
| Name of Judge | Title of Judge |

_Nita L. Stormes_
Signature of Judge

ATTACHMENT A

The Premises to be searched is the residence at 151 Ely Street in Oceanside, California. This residence is located on Ely Street, which is a cul de sac to the north of Tonopah Street. The residence at 151 Ely Street is a two story, cream-colored stucco house with a reddish orange tile roof located on the northwest side of Ely Street.

The house is clearly marked with the numbers "151" in black, four inch numerals on the stucco to the left side of the two-car garage. See photo attached as Exhibit 1, hereto. The front door to the house is located to the left of the two-car garage.

There is a fence bordering the rear of the property. In the back yard of the residence there is a trampoline, some patio furniture and a small brown storage shed. The shed is located on the north side of a concrete patio, adjacent to patio furniture. See aerial photographs of the residence, taken by the FBI, attached as Exhibit 2 hereto.

# EXHIBIT 1



# EXHIBIT 2



## ATTACHMENT B

This authorization includes the search of physical documents and includes electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with paragraph 59 of the affidavit submitted in support of this warrant. Evidence to be seized includes the following:

1.     Containers of CFC R-12 or other Class I ozone depleting chemicals.

2.     Containers of unregistered pesticides.

3.     Any commercial quantity of hazardous materials reasonably identifiable as being not for personal use.

4.     The following records for the period from April, 2005, through the present:

a.     all permanent and temporary files containing records relating to the purchase, sale, transfer, storage, inventory, distribution, and shipment of CFCs and unregistered pesticides, including DDT and chlordane;

b.     all permanent and temporary files containing purchase orders, packing lists, invoices, bills of lading, receipts, electronic mail, PayPal records, and other records related to the shipping of CFCs, including CFC-12, and unregistered pesticides, including DDT and chlordane;

c.     all permanent and temporary files containing correspondence, facsimiles, records of telephone conversations relating to the sale, and distribution of CFCs, including CFC-12, and unregistered pesticides, including DDT and chlordane;

d.     all permanent and temporary files containing records identifying the buyer, recipient, seller, shipper and/or broker of CFCs, and unregistered pesticides;

e.     all permanent and temporary files containing financial records, including ledgers, records of wire transfers, bank statements and cancelled checks, indicating the transfer of funds relating to purchases, sales and shipment of CFCs and unregistered pesticides;

f.     all permanent and temporary files containing telephone books, day planners, rolodexes, business cards and other documents identifying persons doing business with David Grummer;

g.     all permanent and temporary files containing copies of CAA Section 609 Certifications for purchasers of CFCs;

h.     all permanent and temporary files containing David Grummer's hazardous materials training records, including training records regarding the shipment of hazardous materials;

i.     all permanent and temporary files containing records related to the storage of CFCs and unregistered pesticides, including records of the date of accumulation of the hazardous materials;

j.     all permanent and temporary files containing records related to the transportation of hazardous materials by David Grummer;

k.     all permanent and temporary files containing records related to the purchase, sale, shipment, transportation, and storage of hazardous materials by David Grummer for commercial purposes;

l.     all permanent and temporary files containing records, notes, lists, memorandums, or other media showing user names, account names, passwords, personal identification numbers that are related to the access of electronically stored data;

m.     all permanent and temporary files containing records related to communications between David Grummer and/or Free Electronics Disposal, and Federal Express and other interstate commercial transporators, including invoices, billing statements, delivery records, shipping records, and records of payment;

n.     all permanent and temporary files containing records related to federal rules and regulations applicable to the shipment or transportation of hazardous materials, including brochures, pamphlets, industry publications, guidance letters, information printed from internet websites and training materials;

o.     all permanent and temporary files containing records indicating the method and means that David Grummer obtained the unregistered pesticides and CFCs, including intake records, electronic mail, correspondence, facsimiles, records of telephone conversations and records of accumulated storage time;

p.     all permanent and temporary files containing hazardous waste manifests and other records of the transportation, storage and disposal of hazardous waste by David Grummer;

q.     all permanent and temporary files containing records of offers to sell and distribute for sale CFCs and unregistered pesticides over the internet, including but not limited to eBay, Agriseek and other postings, and records of payment for such transactions, including but not limited to PayPal records and records of wire transactions;

2

h.      all permanent and temporary files containing David Grummer's hazardous materials training records, including training records regarding the shipment of hazardous materials;

I.      all permanent and temporary files containing records related to the storage of CFCs and unregistered pesticides, including records of the date of accumulation of the hazardous materials;

j.      all permanent and temporary files containing records related to the transportation of hazardous materials by David Grummer;

k.      all permanent and temporary files containing records related to the purchase, sale, shipment, transportation, and storage of hazardous materials by David Grummer for commercial purposes;

l.      all permanent and temporary files containing records, notes, lists, memorandums, or other media showing user names, account names, passwords, personal identification numbers that are related to the access of electronically stored data;

m.      all permanent and temporary files containing records related to communications between David Grummer and/or Free Electronics Disposal, and Federal Express and other interstate commercial transporators, including invoices, billing statements, delivery records, shipping records, and records of payment;

n.      all permanent and temporary files containing records related to federal rules and regulations applicable to the shipment or transportation of hazardous materials, including brochures, pamphlets, industry publications, guidance letters, information printed from internet websites and training materials;

o.      all permanent and temporary files containing records indicating the method and means that David Grummer obtained the unregistered pesticides and CFCs, including intake records, electronic mail, correspondence, facsimiles, records of telephone conversations and records of accumulated storage time;

p.      all permanent and temporary files containing hazardous waste manifests and other records of the transportation, storage and disposal of hazardous waste by David Grummer;

q.      all permanent and temporary files containing records of offers to sell and distribute for sale CFCs and unregistered pesticides over the internet, including but not limited to eBay, Agriseek and other postings, and records of payment for such transactions, including but not limited to PayPal records and records of wire transactions;

2

**AFFIDAVIT**

I, Leslie Y. Gorman, being duly sworn, hereby declare and say:

1.      I have been a Special Agent ("SA") for the United States Environmental Protection Agency ("US EPA"), Criminal Investigation Division ("CID") for approximately six years. I have a Bachelor of Science degree with a major in Ecology from The University of Georgia. Prior to becoming a Special Agent for the US EPA, I was employed by the US EPA as a biological student trainee from approximately 1999 through 2002. I am a graduate of the Criminal Investigator Training Program and Environmental Investigations Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, where I have also taken advanced courses. I have participated in the execution of numerous search warrants relating to violations of state and federal environmental laws. I have been as serving Special Agent assigned to the San Diego Resident Office, since approximately August 2004.

2.      My duties and responsibilities as a US EPA-CID Special Agent involve the investigation of violations of federal law to include the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136j(a)(1)(A), the Clean Air Act ("CAA"), 42 U.S.C. § 7413(c)(1), the Hazardous Materials Transportation Statute, 49 U.S.C. § 5101, and the regulations promulgated thereunder.

3.      I am familiar with the facts set forth below based on my investigation, as well as a review of records and conversations with other agents of the EPA, FBI and Department of Transportation. This affidavit is made in support of an application for a search warrant authorizing any agent of the United States Environmental Protection Agency Criminal Investigations Division ("EPA-CID") and technical assistance staff (with appropriate assistance from other agencies including the FBI, DOT, and any other agency necessary to assist in the execution of the search warrant) to

search the premises further described in Attachment A attached hereto. This affidavit is made for the purpose of demonstrating probable cause for the requested warrant and does not set forth all of my knowledge of or investigation into this matter.

4.      The premises described in Attachment A is believed to contain evidence of and instrumentalities of criminal violations of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136j(a)(1)(A), the Clean Air Act ("CAA"), 42 U.S.C. § 7413(c)(1), the Hazardous Materials Transportation Statute ("HMTS"), 49 U.S.C. § 5101, and the regulations promulgated thereunder, further described in Attachment B attached hereto.

5.      FIFRA prohibits the sale of unregistered pesticides, such as chlordane and DDT. The CAA prohibits the sale of CFC R-12, a listed class I ozone depleting substance, to an individual who does not possess the proper EPA certification. The HMTS and the regulations promulgated thereunder prohibits improper packaging, labeling and marking of a hazardous materials shipment; improper or false declaration of hazardous materials; and the transportation of hazardous materials without proper shipping papers.

6.      Section 7413(c) of Title 42 (the Clean Air Act) makes it a criminal offense for any person to knowingly violate any requirement or prohibition of the subchapter on Stratospheric Ozone Control. Within the subchapter on Stratopheric Ozone Control, Section 7671h(a) requires the EPA to promulgate regulations relating to servicing motor vehicle air conditioning units. Those regulations, set forth in part at 40 C.F.R. § 82.154(m) state that "No person may sell or distribute or offer for sale or distribution, any substance that consists in whole or in part of a class I or class II substance for use as a refrigerant to any person unless...the buyer has been certified in accordance with 40 C.F.R. Part 82, Subpart B and the refrigerant is either R-12 or an approved substitute consisting in whole or in part of a class I or class II substance for use in motor vehicle air conditioners

2

in accordance with 40 C.F.R. Part 82, Subpart G." R-12 (CFC-12) is a Class I substance for purposes

of stratospheric ozone control. 40 C.F.R., Part 82, Subpart A, Appendix F.   The chemical name for

CFC-12 is dichlorodifluoromethane.

7.      The regulations in Subpart B of 40 C.F.R., Part 82 require a buyer to obtain

certification that the person has acquired and is properly using approved refrigerant recycling

equipment in service on motor vehicle air conditioners involving refrigerant and that each individual

authorized by such person to perform such service is properly trained and certified.    40 C.F.R.

§ 82.34.

8.      The prohibition of the sale or distribution of R-12 to uncertified buyers is repeated at

40 C.F.R. § 82.34(b) for containers of less than 20 pounds of refrigerant.  This section requires the

purchaser to be properly trained and certified under Section 82.40.  Section 82.40(a) requires any

technician training and certification program to seek approval of the EPA Administrator to administer

such training.  Section 82.40(a)(4) requires the approved training program to offer individual proof

of certification, such as a "wallet sized card, or display card" with a unique identifying number for

each certified technician that has successfully completed the program.  Section 82.42(b)(3) requires

that any person who sells or distributes any class I substance suitable for use as a refrigerant in

containers of less than 20 pounds "must verify that the purchaser is properly trained and certified

under Section 82.40."

9.      The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) provides criminal

penalties for the knowing violation of any provision of FIFRA by any person who distributes or sells

pesticides. 7 U.S.C. § 136l(b)(1)(B).  Section 136j(a)(1)(A) provides that it shall be unlawful for any

person to distribute or sell to any person any pesticide that is not registered under section 136a or

whose registration has been canceled or suspended.  The term "distribute or sell" means to offer for

3

sale, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or to receive and deliver or offer to deliver. 7 U.S.C. § 136(gg). The term "pesticide" means any substance or mixture of substances intended for preventing, destroying, repelling or mitigating any pest, or any substance or mixture of substances intended for use as a plant regulator, defoliant, or desicant, and any nitrogen stabilizer. 7 U.S.C. § 136(u).

10.     DDT [also known as 1,1,1 trichlorophenyl ethane, or 1,1,1-trichloro-2,2-bis (pchlorophenyl) ethane] is a pesticide that had been used extensively in the control of agricultural pests and insect vectors of diseases. On January 15, 1971, the EPA Administrator issued cancellation notices for all registrations of insecticides containing DDT. Thereafter, on June 14, 1972, the EPA Administrator reaffirmed the cancellation of pesticide registrations for all uses of DDT in crop production which became effective December 31, 1972. The order permitted only a few very restricted uses that do not apply in this case.

11.     Chlordane is an organochlorine pesticide that had been used to destroy ants, termites and other insects. In 1983, the EPA cancelled the registration of pesticides containing chlordane for food crops and permitted its use only to control subterranean termites. All use was to be phased out over the next five years. On April 15, 1988, all registrations of chlordane insecticides were cancelled, and the distribution, sale and shipment of chlordane products was prohibited. Its commercial use was banned, except for use to control fire ants in power transformers, while homeowners were permitted to use their existing stock in their possession for termite control.

12.     The Hazardous Waste Transportation Statute (HMTS) was enacted in 1990 for the purpose of providing "adequate protection against the risks to life and property inherent in the transportation of hazardous materials in commerce." 49 U.S.C. § 5101. The HMTS requires the U.S. Department of Transportation to promulgate regulations for the safe transportation of hazardous

4

materials in intrastate, interstate and foreign commerce and to regulate the safety aspects of the

transportation of hazardous materials. 49 U.S.C. § 5103(b)(1). These regulations apply to persons

transporting hazardous materials in commerce and causing hazardous materials to be transported in

commerce. Section 5124 of Title 49 of the United States Code provides criminal penalties for willful

violations of the HMTS or a regulation prescribed or order issued thereunder.

13.    The HMTS requires the DOT to designate materials as hazardous if the transportation

of such material in commerce is deemed to pose an unreasonable risk to health, safety or property.

49 U.S.C. § 5103(a). The Department of Transportation has developed a Table of Hazardous

Materials and Special Provisions, set forth at 49 C.F.R. § 172.101. All materials listed on the Table

are considered hazardous materials for purposes of the HMTS. DDT, Chlordane and CFC-12 are all

identified as hazardous materials under the HMTS.

14.    The regulations implementing the HMTS require each person who offers a hazardous

material for transportation to describe and declare the hazardous materials in the shipping documents,

which must accompany the shipment. 49 C.F.R. § 172.200. There are a number of specific

requirements for the identification and description of hazardous materials in shipping papers, found

at 49 C.F.R. § 172.201. For example, each description of a hazardous material in shipping documents

must be "highlighted" or printed in an ink color that contrasts with any description of non-hazardous

materials in the same shipment. 49 C.F.R. § 172.201(a)(1). Further, specific descriptions of the

materials on the shipping papers are required, to include the identification number, shipping name,

hazard class and packing group set forth for each material on the Table of Hazardous Materials found

at 49 C.F.R. § 172.101. 49 C.F.R. § 172.202. Each person who offers a hazardous material for

transportation shall also certify in writing that the material is offered for transportation in accordance

with the safety requirements contained in 49 C.F.R., Subchapter 172. 49 C.F.R. § 172.204. The

shipping records are required to be maintained by the shipper for a period of three years for hazardous waste and two years for other hazardous materials.  49 C.F.R. § 172.201(e).

**Investigation Regarding David M. Grummer**

15.    I am familiar with the facts set forth in this affidavit based on my discussions with various officials and employees of the US EPA, undercover phone conversations and meetings with Grummer, undercover purchases from Grummer, as well as my review of documents, to include PayPal, Ebay, FedEx and financial records.

16.    On approximately April 6, 2006, the EPA CID San Francisco Area Office referred to me an allegation that an individual by the name of David Grummer was selling unregistered pesticides over the internet.  The EPA Region 9 office in San Francisco provided me with a copy of an advertisement posted on www.agriseek.com for the sale of DDT and chlordane.  The advertisement stated that the seller had "50% powdered DDT in one pound box" and "74% and 45% Chlordane in all sizes" for sale.  The seller also stated in the advertisement "I can send pictures" and "I send everything FED-X Ground in Five gallon HAZMAT sealed buckets in vermiculite absorbent. The shipping cost between $15 and $35 dollars.  If you have any questions please EMAIL ME."  The contact person listed on the advertisement was "Mr. David Grummer" and the location listed on the advertisement was "Oceanside, California."

17.    On approximately June 3, 2006, I received information in response to a records check that indicated that David M. Grummer resided at 151 Ely Street in Oceanside, California.

18.    On approximately July 6, 2006, I sent a reply to the advertisement posted on www.agriseek.com.  In the reply, I stated that I was interested in purchasing chlordane and DDT and inquired as to what type of payment would be accepted.

6

19.  On approximately July 7, 2006, I received a reply e-mail from "David Grummer" <grumster@yahoo.com> stating that he accepted "paypal and check" and "any questions call 760-717-9463."

20.  On approximately July 10, 2006, I conducted surveillance on a residence located at 151 Ely Street in Oceanside, California. During the surveillance, I witnessed two Ford pick-up trucks parked in the driveway of 151 Ely Street bearing California license plates "LTLMOOS" and "BIGMOOS."

21.  On approximately July 13, 2006, I received information from California Department of Motor Vehicles ("DMV") in response to a request regarding California license plates "LTLMOOS" and "BIGMOOS." DMV provided that "BIGMOOS" was a 2000 Ford pick-up registered to David M. Grummer at 151 Ely Street in Oceanside, California, bearing vehicle identification number ("VIN") 2FTZF0736YCA81838. DMV provided that "LTLMOOS" was a 2006 Ford pick-up registered to David M. Grummer at 151 Ely Street in Oceanside, California, bearing VIN 1FTYR14U16PA20933.

22.  On approximately July 11, 2006, I replied to Grummer at <grumster@yahoo.com> and requested that he send photos. On approximately July 11, 2006, I received an e-mail from <grumster@yahoo.com> containing approximately four (4) photos of bottles of chlordane and one (1) photo of a bottle of DDT. Consultation with EPA personnel indicated, based on the labels and the physical appearance of the bottles, the products in the photos appeared to be old products of DDT and chlordane manufactured in the U.S. prior to the cancellation of the registrations of these pesticides.

23.  On approximately October 4, 2006, I received DMV information indicating that David M. Grummer, residing at 151 Ely Street in Oceanside California, possessed a "TSA Clearance

7

Approved Hazardous Materials Endorsement" on his California Driver's License. According to the information posted on the DMV website, to obtain such a Hazardous Materials endorsement, individuals must pass an exam testing the knowledge of the Hazardous Materials Regulations found at 49 C.F.R. Part 171, which govern the safety aspects of transportation. These regulations include requirements for classification of materials, packaging (including manufacture, continuing qualification, and maintenance), hazard communication (i.e., package marking, labeling, placarding, and shipping documentation), transportation, handling, employee training, and incident reporting.

24. On approximately October 11, 2006, I again responded to Grummer's advertisement for the sale of DDT and chlordane posted on www.agriseek.com. In the response, I asked if he still had chlordane for sale and if not, did he know where I could buy some.

25. On approximately October 12, 2006 I received two reply e-mails from grumster@yahoo.com. The first reply e-mail stated "How much do you need . . . call me at 760-717-9463." The second reply e-mail stated "Yes I have 3 gallons of 74%. David 760-717-9463."

26. On approximately November 15, 2006, an EPA-CID Special Agent, acting in an undercover capacity ("UCA1"), contacted Grummer at 760-717-9463 and recorded the conversation. UCA1 informed Grummer that he had a termite problem and inquired about purchasing chlordane. UCA1 stated to Grummer that he was unable to find chlordane in the stores. Grummer informed UCA1 that chlordane has been off the market for approximately fifteen (15) years so he would not be able to find it in a store. Grummer informed UCA1 that he "deals with San Diego's hazardous waste problems." UCA1 asked Grummer the percentage of the chlordane content in the products he currently had for sale. Grummer replied "let me go outside and check" and relayed that he currently had 74% chlordane in a one (1) quart bottle. Grummer informed UCA1 how to apply the chlordane to his house. UCA1 asked where to store the leftover chlordane and asked Grummer where he stored

8

his chlordane.  Grummer informed UCA1 that he stored his chlordane in "a little storage shed outside."

27.     UCA1 inquired if Grummer had DDT for sale as stated in Grummer's advertisement on www.agriseek.com.  UCA1 informed Grummer that his grandmother had a bedbug problem. Grummer stated that he "sent out about . . . five gallons of DDT in the last six months just for bedbugs."  Grummer relayed to UCA1 that the chlordane would cost "ninety bucks.  That includes shipping."  UCA1 informed Grummer that he would be in the San Diego area in the near future to pick up the chlordane and did not wish to risk having the chlordane bottle break in the mail. Grummer replied "considering that I've shipped about seventy-five (75) to a hundred (100) gallons of this stuff and never had a bottle break, I'm pretty good at packing."  UCA1 arranged to meet with Grummer to purchase the pesticides.  Grummer stated "just so you know, I got right now in my garage . . . a half a bottle of DDT, a quart, which will make about twenty gallons of mixture".  Grummer informed UCA1 that DDT has been "off the market for thirty one years."  UCA1 arranged to meet Grummer in Oceanside on approximately November 28, 2006, to purchase DDT and Chlordane for approximately two hundred ninety dollars ($290.00).

28.     On approximately November 27, 2006, UCA1 contacted Grummer telephonically to confirm the meeting to be held on November 28, 2006.  Grummer stated ". . . I wanna get thirty minutes notice so I can actually go to where I need to be . . . And then I'll grab my stuff from my house and then I'll head over there."

29.     On approximately November 28, 2006, UCA1 contacted Grummer telephonically to arrange to meet him at the Office Depot Parking lot located on Mission Avenue in Oceanside. Grummer stated to UCA1 that the location was "right around the corner" from his house.  Grummer

9

informed UCA1 that he would "head home" and "it's only five minutes from my house from where the stuff's at."

30.    At approximately 2:27 p.m., on November 28, 2006, Grummer pulled into an Office Depot parking lot located at 1046 Mission Avenue in Oceanside, California driving a blue/purple Ford Pick up truck bearing the California license plate "LTLMOOS" to meet UCA1 and another undercover agent ("UCA2"). Video and audio recording were made of the meeting. Grummer pulled a white five (5) gallon bucket out of his vehicle containing what appeared to be a bottle of chlordane and a bottle of DDT. Grummer told the undercover agents how to mix and apply the pesticides. Grummer stated to the undercover agents that "they haven't made it for thirty years" and "this stuff they haven't made for like fifteen years," referring to the DDT and chlordane, respectively.

31.    Grummer proceeded to inform the undercover agents that he "runs all the hazardous waste programs for San Diego County." Grummer stated that "anybody who deals with hazardous waste, brings it to us. And then sometimes when we get stuff like this [referring to chlordane and DDT] my chemist will actually go and test it in our lab and then basically the pure stuff he gives back to us . . . and that's the stuff that we actually sell."

32.    Grummer informed the undercover agents, ". . . the one thing that's most important to us is, we sell a lot of Freon. We get Freon in like crazy; you know the thirty gallon things . . . of Freon. And those things you can't buy anymore . . . And they still use 'em and we sell one for like four hundred and fifty bucks. Just one thirty gallon thing, and we get 'em in all the time. That's our money maker." Grummer opened a storage compartment located in the bed of his pick-up truck to show the undercover agents a number of 12 ounce cans of Freon and stated, "Yeah, these are the ones we get all the time. These little ones . . . like this. And then we get the . . . the big huge ones we leave at the office. But I got about, I don't know, I got about thirty of 'em in there.

10

33.     When undercover agents inquired if the Freon was from Mexico, Grummer replied,
"Uh, we. . .no.  That stuff is people here in the States that had it in their garage, had it settin' aside,
they bring it to us to get rid of . . . and then basically our guys take it, call me up and say hey, . . . this
is the stuff.  Everybody meets at our same office and then we just . . . have our own locker there that
we keep stuff stored in."  Grummer informed undercover agents when discussing the price of Freon,
"In the summertime we could sell 'em for six hundred bucks a pop because everything's hot,
everybody needs it, that's the way it works."  When questioned by undercover agents when Freon was
banned, Grummer replied, ". . . about nine years ago . . . ten years ago" and stated ". . . everything's
R-134 now."  Grummer offered Freon for sale to the undercover agents.  The undercover agents stated
they would contact Grummer if they needed to buy Freon.

34.     Grummer gave the undercover agents two (2) business cards, which stated that David
Grummer was the "HHW Project Manager" for Clean Harbors Environmental Services, 9369 Dowdy
Drive, Suite G in San Diego.  The phone numbers listed on the business card were 858-547-3115 and
Mobile: 858-583-0508.

35.     UCA1 asked how Grummer typically shipped pesticides.  Grummer stated that he
utilized hazardous waste buckets and packed the product in vermiculite (an absorbent) for shipping.
Grummer stated, ". . . I'm used to packin' hazardous waste so I already know what I'm doin.'"

36.     Undercover agents purchased a full, one (1) quart bottle of liquid chlordane and one
(1) quart bottle, approximately half full of liquid DDT from Grummer for approximately one hundred
ninety dollars ($190.00) before departing the Office Depot parking lot.  At no time did the UCAs
observe any shipping papers relating to the shipment of DDT and Chlordane.  Grummer did not
request that they sign any documentation for the receipt of the DDT or Chlordane, and provided no

11

paperwork at all to the UCAs: no bill of sale, invoice, waybill or other shipping document or record of sale.

37.    On approximately December 5, 2006, the pesticide products purchased from Grummer during the undercover meeting on approximately November 28, 2006, were shipped to EPA's National Enforcement Investigations Center ("NEIC") laboratories for analysis.

38.    On approximately March 19, 2007, I received a Criminal Technical Report which included analytical results from NEIC for pesticide products purchased from Grummer on approximately November 28, 2006. The Criminal Technical Report confirmed that the bottle labeled "DDT-25 Spray," contained DDT and the bottle labeled "Ortho-Klor 74 chlordane Spray," contained chlordane.

39.    On approximately May 18, 2007, UCA2 contacted Grummer telephonically at the cellular phone number listed on the business card provided to undercover agents by Grummer on approximately November 28, 2007, which was 858-583-0508. The telephone conversation was recorded. During the phone conversation, UCA1 asked if Grummer had Freon for sale. Grummer stated that he had Freon and would sell one (1) thirty pound (30lb) cylinder of Freon to UCA2 for approximately three-hundred dollars ($300.00). Grummer agreed to deliver the freon on approximately June 6, 2007.

40.    On approximately June 7, 2007, a meeting took place at the City of Vista's Household Hazardous Waste facility ("HHW facility") located at 1145 East Taylor Street in Vista, California, which is Grummer's place of employment. Grummer, as indicated on his business card, is a Household Hazardous Waste Program Manager for Clean Harbors. Clean Harbors, Grummer's employer, has a contract to operate the HHW facility located at 1145 East Taylor Street. The HHW facility is a permitted facility where residents of Vista can bring small quantities of hazardous wastes

12

from their homes, such as waste paints, solvents, compressed gases and pesticides. The HHW facility is permitted to store the waste and obligated to legally dispose of such wastes. Audio and video recordings were made of the meeting on June 7, 2007.

41.    When legally disposing of hazardous waste, anyone shipping the waste to a disposal site must prepare a hazardous waste manifest to accompany the shipment, pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 7601 et seq. The manifest must identify the nature and quantity of the waste, the name and address of the generator, the name and address of the transporter, and the name and address of the disposal site. A hazardous waste manifest is a multi-copy form which is signed in the first instance by the generator and by the receiving shipper. The shipper retains a copy, signed by the disposal site, and the disposal site signs a copy and returns it to the generator to verify that the waste has been disposed of properly. A copy is also sent to the California Environmental Protection Agency, which operates as the EPA's enforcement arm for RCRA in California. Hazardous waste manifests must be retained by all involved for a period of three years. In general, hazardous waste may be stored at a permitted storage location for 90 days prior to lawful disposal. The storage location must have records indicating the accumulation date of the hazardous waste, and a label on the container itself must clearly state the accumulation date. At a permitted storage facility, hazardous wastes are required to be stored in specified locations, to prevent the co-mingling of incompatible wastes.

42.    On June 7, 2007, Grummer contacted UCA1 via telephone and informed him that he was on his way to the Vista HHW facility from his house. Grummer arrived at the HHW facility at approximately 10:17 a.m., and gave the undercover agents a tour of the facility. Grummer opened storage lockers and described their contents (electronic waste, poisons, flammables, oxidizers, corrosives) to the agents. Grummer provided a thirty-pound (30lb) Freon cylinder to the undercover

13

agents from the back of a box truck parked at the HHW facility and stated ". . . this is your thirty pounder." The cylinder bore a label marked "Dupont Freon 12." The label indicates that the freon was manufactured in the United States, and the chemical name for CFC-12, dichlorodifloromethane, appears on the label. Grummer stated that the cylinder was full. UCA1 inquired if Freon was available for sale at local automotive stores. Grummer replied, "No, you haven't been able to buy this stuff for probably ten years now." UCA1 stated that his cousin was unable to purchase Freon in an automotive store because he did not possess a permit. Grummer stated, "have him give me a call." Grummer told undercover agents that a permit is required to purchase Freon and stated, "all you have to do is take one test. That's all you gotta do is take a test. It's like thirty bucks for the test, that's it." When UCA1 told Grummer that he would have his cousin contact him, Grummer tapped the Freon container and stated, "I got a million of these in the garage so whenever . . . these guys find 'em, I pay them for 'em and then . . . you guys buy 'em." UCA1 inquired if Grummer kept the Freon at his house and Grummer replied, "yes I do."

43.      On approximately January 8, 2008, I spoke with Marie Broadwell, Environmental Protection Specialist with EPA Region 9 Stratospheric Protection Program. Broadwell stated that a certification, commonly referred to as a Section 609 Certification, was required for individuals wanting to purchase and/or work with Freon CFC R-12 refrigerant for use in automobiles. Broadwell stated that to obtain Section 609 Certification, an individual must pass one test. The certification received after passing the test is valid indefinitely. Broadwell stated that the Section 609 Certification test costs approximately between fifteen and thirty dollars ($15-$30). Broadwell stated that a Section 609 Certification was required to purchase twelve ounce (12oz) cans of Freon CFC R-12. Broadwell stated that a distributor (seller) of Freon CFC R-12 must obtain a copy of a buyer's Section 609 Certification and retain the certification for approximately three (3) years.

14

44.    At no time did the UCAs represent that they possessed the 609 Certification necessary to purchase the refrigerant. Grummer never asked to see verification of their certification and never asked if they possessed the certification at all. The UCAs observed no shipping documents in the possession of Grummer related to the shipment of the freon. Grummer did not provide them with any bill of sale, invoice, waybill or shipping documents, or request that they sign any shipping documentation for him.

45.    On approximately August 8, 2007, the freon purchased from Grummer during the undercover meeting on approximately June 7, 2007, was field tested and sub-sampled. Field testing confirmed that the thirty pound (30lb) cylinder purchased from Grummer contained 100% CFC-12 (R-12 freon). Two (2) sub-samples taken from the thirty pound (30lb) cylinder were shipped to EPA's National Enforcement Investigations Center ("NEIC") laboratory for analysis.

46.    On approximately November 08, 2007, I received records from eBay and PayPal. These records indicate that Grummer has been illegally selling unregistered pesticides as early as 2005 and Freon as early as 2007. According to PayPal records, Grummer sold and shipped unregistered pesticides, to include DDT and chlordane, on approximately fifty-three occasions between April 2005 and October 2007. According to PayPal records, Grummer sold and shipped Freon CFC-12 (R-12) on three (3) occasions between April 2005 and October 2007. One purchaser commented in the notes section, "David . . . I'm happy to get your R12." According to eBay records, Grummer sold unregistered pesticides on three occasions and Freon CFC R-12 on two occasions from April 2006 through August 2007.

47.    On approximately January 8, 2008, I received records indicating that the subscriber for phone number 760-717-9463 was David Grummer at 151 Ely Street in Oceanside, California.

15

48.     On approximately January 10, 2008, I learned that the IP addresses associated with some of Grummer's PayPal logins related to unregistered pesticide and Freon CFC R-12 sales were registered to Clean Harbors Environmental through AT&T WorldNet Services. The Clean Harbors Environmental address was listed as 42 Longwater Drive in Norwell, Massachusetts. Other PayPal logins were traced to addresses belonging to Cox Communications.

49.     The website for Clean Harbors (www.cleanharbors.com) lists the corporate offices at 42 Longwater Drive, P.O Box 9149, in Norwell, Massachusetts. The website describes Clean Harbors as "North America's leading provider of environmental and hazardous waste management services. With an unmatched infrastructure of 49 waste management facilities, including nine landfills, six incineration locations and six wastewater treatment centers, the Company provides essential services to over 45,000 customers, including more than 325 Fortune 500 companies, thousands of smaller private entities and numerous federal, state and local governmental agencies. Headquartered in Norwell, Massachusetts, Clean Harbors has more than 100 locations strategically positioned throughout North America in 36 U.S. states, six Canadian provinces, Mexico and Puerto Rico."

50.     On approximately January 9, 2008, I interviewed Mary Avastu of the San Diego County Environmental Health Services Hazardous Materials Management Division. Avastu stated that she attended a meeting at Clean Harbors located at 9369 Dowdy Drive on approximately July 9, 2007. Avastu stated the meeting was held in an open room with a conference table and several desks. Avastu stated that during this meeting, she was approached by an individual who introduced himself as David Grummer. Avastu witnessed Grummer working at a desk located to the left side of the entrance into the room. Avastu recalled that the desk was up against the left wall of the room and located approximately one half to three quarters down the length of the room. Avastu recalled seeing a computer on the desk where Grummer was working. Avastu recalled meeting Grummer earlier at

16

an inspection conducted at the Vista Household Hazardous Waste Facility, and recalled no computer at the Vista facility.

51.    At approximately 1:30 p.m., December 18, 2007, UCA2 contacted Grummer telephonically at 858-583-0508 to inquire if he had Freon for sale. The telephone conversation was recorded. Grummer stated he currently had the "little ones." Grummer stated that it would take approximately three (3) to four (4) 12 ounce cans of Freon to fill up the car described by UCA2. Grummer said that he would sell the Freon for approximately ten dollars ($10) for each 12 ounce can. UCA2 stated that he would contact Grummer at a later time for the purchase.

52.    On approximately January 11, 2008, I received from NEIC a Criminal Technical Report which included analytical results for the sub-samples of the freon purchased from Grummer on approximately June 7, 2007. The Criminal Technical Report confirmed that the sub-samples both contained R-12 refrigerant.

53.    On approximately 9:00 a.m. on January 14, 2008, UCA2 contacted Grummer, and requested that Grummer ship him the three twelve ounce cans of R-12 Freon refrigerant (CFC-12). Grummer agreed and stated that it would cost about $10 per twelve ounce can and about $7 for shipping. Grummer stated that he would ship the package after he got home. Grummer never asked UCA2 if he or anyone using the freon he was shipping possessed the 609 certification necessary for the sale. Agents conducting surveillance of Grummer observed him at his home at 151 Ely Street in Oceanside at approximately 2:00 p.m. Agents followed him as he drove his Ford Ranger, California license plate LTLMOOS, from his home until he stopped at the FedEx location at 2444 Vista Way in Oceanside. Grummer was observed in the FedEx store with a package, and he returned to his vehicle without the package.

17

54.    On January 14, 2008, agents entered the FedEx location at 2444 Vista Way, seeking the package shipped by Grummer to UCA2. Grummer had orally identified the contents to the FedEx employees handling the transaction as a car part. The shipping documents (customer shipment records completed by Grummer) accompanying the shipment of the three twelve ounce cans of R-12 freon did not identify the shipment as a hazardous material, as required by the HMTS regulations. The package was not properly marked to identify it as a hazardous material, as required by the HMTS regulations.

55.    On January 15, 2008, the package shipped by Grummer was opened by agents at the offices of the San Diego County Department of Environmental Health Services, Hazardous Materials Management Division. The package contained 3 fourteen-ounce cans, marked "Sercon, Refrigerant 12," and bore the chemical name for CFC-12, dichlorodifloromethane. The package contained no invoice, bill of sale, waybill or other shipping papers identifying the shipment as a hazardous material, in fact, no paperwork whatsoever. The printed return address on the shipment was Free Electronic Disposal Services, 151 Ely, Oceanside, California, account number 3244-5242-7, while the other handwritten label identified the shipper as "David Grummer, 151 Ely, Oceanside, California." Both printed and handwritten labels bore the telephone number of 760-717-9463 for the shipper.

56.    According to FedEx Express records dated November 6, 2007, the shipper for account number 3244-5242-7 is Free Electronics Disposal located at 151 Ely Street in Oceanside, California. The individual associated with the account number is David M. Grummer at telephone number 760-717-9463.

57.    On January 16, 2008, I received information from Cox Communications, indicating that David Grummer, 151 Ely Street, Oceanside, California, has been a Cox Communications internet subscriber since some time in 2003.

18

58.     Based on the foregoing, I believe there is probable cause to believe that the premises described more fully in Attachment A contains evidence and instrumentalities of violations of the Federal Insecticide, Fungicide, And Rodenticide Act (FIFRA), 7 U.S.C. 136j(a)(1)(A) (illegal sale of chlordane and DDT, which are banned pesticides), the Clean Air Act (CAA), 42 U.S.C. § 7413(c)(1) (illegal sale of CFC R-12, a listed Class I Substance under the CAA, to an individual who does not possess the proper EPA certification), the Hazardous Materials Transportation Statute, 49 U.S.C. § 5101, and the regulations promulgated thereunder (improper packaging, labeling and marking of a HazMat shipment; improper or false declaration of HazMat; and the transportation of HazMat without shipping papers), as further described in Attachment B hereto.

### COMPUTER SEARCH PROTOCOL

59.     With the approval of the court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers that may be found on the premises which may contain information subject to seizure pursuant to this warrant:

#### Forensic Imaging

a.     There is probable cause to believe that the computer(s) used by Grummer contains evidence of crime - the solicitations to purchase the unregistered pesticides and CFC-12. Consequently, this data is subject to seizure as provided at Rule 41(c)(2), Fed.R.Crim.P. As this data cannot effectively be segregated onsite from other data which may be stored on the computer(s) and cannot be left behind, the computers will be seized and transported offsite for imaging. Once a verified image has been obtained and the data subjected to a preliminary review, any computers which do not contain evidence of the sale and shipment of unregistered pesticides, CFC-12 or improperly shipped hazardous materials will be returned to the owner. The imaging and preliminary review process, depending upon the number of computers seized, the volume of data contained on the

19

computers, any steps taken by the owners to conceal the stolen data or use of that data and the software deployed on the computers, can take up to 90 days. It should be noted that some database programs cannot be searched by keywords without first extracting the data from the image and importing it into a new, clean compatible version of the database software on a separate, forensic computer.

b.      A forensic image is an exact physical copy of the hard drive or other media. It is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. A forensic image captures all of the data on the hard drive or other media without the data being viewed and without changing the data in any way. This is in sharp contrast to what transpires when a computer running the common Windows operating system is started, if only to peruse and copy data - data is irretrievably changed and lost. Here is why: When a Windows computer is started, the operating system proceeds to write hundreds of new files about its status and operating environment. These new files may be written to places on the hard drive that may contain deleted or other remnant data. That data, if overwritten, is lost permanently. In addition, every time a file is accessed, unless the access is done by trained professionals using special equipment, methods and software, the operating system will re-write the metadata for that file. Metadata is information about a file that the computer uses to manage information. If an agent merely opens a file to look at it, Windows will overwrite the metadata which previously reflected the last time the file was accessed. The lost information may be critical.

c.      Special software, methodology and equipment is used to obtain forensic images. Among other things, forensic images normally are "hashed", that is, subjected to a mathematical algorithm to the granularity of 1,038 power, an incredibly large number much more accurate than the best DNA testing available today. The resulting number, known as a "hash value"

20

confirms that the forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity. Any change, no matter how small, to the forensic image will affect the hash value so that the image can no longer be verified as a true copy.

**Forensic Analysis**

d.      After obtaining a forensic image, the data will be analyzed. Analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. There are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e.      Analyzing the contents of a computer, in addition to requiring special technical skills, equipment and software also can be very tedious. It can take days to properly search a single hard drive for specific data. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. As mentioned above, the computer may have stored information about the data at issue: who created it, when it was created, when was it last accessed, when was it last modified, when was it last printed and when it was deleted. Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed. Operation of the computer by non-forensic technicians effectively destroys this and other trace evidence. Moreover, certain file formats do not lend

21

themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Microsoft Outlook data is an example of a commonly used program which stores data in a non-textual, proprietary manner– ordinary keyword searches will not reach this data. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text.

        f.      Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has become mind-boggling. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now capable of storing more than 100 gigabytes of data and are commonplace in new desktop computers. And, this data may be stored in a variety of formats or encrypted. The sheer volume of data also has extended the time that it takes to analyze data in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Even perusing file structures can be laborious if the user is well-organized. Producing only a directory listing of a home computer can result in thousands of pages of printed material most of which likely will be of limited probative value.

        g.      Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained; criminals can mislabel and hide files and directories, use codes to avoid using

keywords, encrypt files, deliberately misspell certain words, delete files and take other steps to defeat law enforcement. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear necessary to locate and retrieve digital evidence within the scope of this warrant.

        h.     All forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant. In the course of proper examination, the forensic examiner may view information not within the scope of the warrant. Such information will not be made available to the investigating agents unless it appears to the examiner that the information relates to the commission of offenses not covered by this warrant. In that event, the examiner will confer with the investigator so that the investigator can determine whether to seek a further search warrant for the newly uncovered data.

        I declare under penalty of perjury that the foregoing is true and correct.

LESLIE Y. GORMAN, Special Agent
Environmental Protection Agency
Criminal Investigation Division

Subscribed to and sworn before me
this _16_ day of January, 2008.

NITA L. STORMES
United States Magistrate Judge

23